We've got one case left on the oral argument calendar this morning, and I'm not sure I can pronounce the name correctly, M-A-K-A-G, M-A-K-A-J v. Mukasey. When you're ready, Counsel. Mukaj. Say it again. Mukaj. Mukaj, thank you. Your Honors, may it please the Court, Elias Batchelder, Counselor for Petitioner Data, Nicole Mukaj. Your Honors, Mr. Mukaj is present in the Court today with his wife and children. At this time, I'd like to reserve one minute for rebuttal. Okay. Your Honors, the BIA's decision in this case must be reversed for two reasons. First, its decision to deny Mr. Mukaj's claim under the Convention Against Torture is unsupported by substantial evidence in the record. Second, the BIA's decision improperly employed the incorrect legal standard in analyzing Mr. Mukaj's CAT claim. First, the BIA's decision is unsupported by substantial evidence. In this case, the BIA cursorily affirmed the decision of Immigration Judge John W. Davis, a decision which contained glaring factual inaccuracies and omissions that were central to Mr. Mukaj's CAT claim. It did so on the basis of two facts and two facts alone. Isn't it more logical to proceed the other way? If they apply the wrong standard, then it doesn't make sense to ask the question of whether there was substantial evidence on the wrong standard. Certainly, we can proceed in whichever order, Your Honors. Now, if we decide that the IJ did apply the wrong standard and the BIA applied the wrong standard, do we have any choice? That is to say, aren't we required to send it back for them to re-decide it under the correct standard? Or can we simply say, well, you decided it under the wrong standard, but we, looking at this, can say there's no substantial evidence. What's Ventura tell us to do? Yes. Well, I would say with regard to the remedy, Your Honors, if this Court decides on the grounds that the BIA employed the improper legal standard, I submit that it must send the case back to the BIA for reconsideration. Okay. Which is one of the reasons that I think this Court should save the agency's time and consider his claim that the decision was not based on substantial evidence. In that case, Your Honors, if the BIA's decision is not supported by any substantial evidence in the record, then there's no point in sending the case back, and this Court can simply decide on that ground without requiring a remand. But, Counsel, here's my problem, I guess. There's no question that the BIA had in front of it country conditions. No question that the BIA, upon remand from us, talks about a democratically elected government, no evidence that the Communists or supporters have sought retribution against opponents in the country, all of these kind of things. The best, I think, that I can say for you is that they may not have applied it to your client individually, because there's no question they had the sufficient evidence in front of them, and if we're in a substantial evidence test, they have some evidence there that will support what they did. Isn't the best I can do is to say it didn't go specifically to your client? No, although that is one ground upon which you can rule. I mean, you have to look at there's only really two pieces of evidence that the BIA considered in its decision. The BIA references the return trips to Albania, and it references the changed country conditions. Let me address each in turn. With regard to the return trips to Albania, the BIA found that Mr. Mukaj returned to Albania anywhere from three to four times in the 1990s. If you combine this, these return trips with the other two return trips by members of adult males in Mr. Mukaj's family, Talbania, that of Rok Mukaj and George Mukaj, you have six trips by members of adult male members of the family in the 1990s. Of these six trips, one led to the murder of Rok Mukaj. A second led to the near murder of George Mukaj. And the third trip led to a death threat on Mr. Mukaj's life. Now, this piece of evidence is particularly significant because it shows that not only were there people in Albania that were interested in harming Mr. Mukaj, but that they were able and willing to take the time to track him down, uncover his whereabouts while in hiding in Albania at his mother's house, and even to uncover his home telephone number in the United States to deliver the threat. Let me ask you this. This is kind of an ignorant question on my part, but it occurred to me as I've been reading this, all the cat claims that I've dealt with before have dealt with threats of torture as torture is ordinarily defined. Here the primary worry is not torture in the ordinary lay sense, but rather he's going to be killed. Is being murdered torture within the meaning of cat? I believe that there is – there have been some cases where I've seen it. I'm sorry. I'd be happy to brief the court on this, but since it wasn't raised in the government's brief, I didn't address it. There are cases where – Unless you get an order from us to do so, don't worry about it. Okay. No government prosecutor to my knowledge has been so bold as to claim that it's okay to send someone back to their death, but it's not okay to send them back to be tortured. Let me ask you another question, Counselor, because when I read the evidence in front of the BIA, I read and they seem to indicate that there's a 2004 report that there's been no major outbreaks of political violence since 1998. Neither the government nor political parties encourage or engage in policies of abuse or coercion. The nature of the political system has changed fundamentally. And they further say 1997 was a particularly dangerous rule or year. So if I have in front of me and I'm looking for substantial evidence, it seems to me that there's nothing in this application that deals with past 1997. There's nothing in here that suggests that what they've done in general therefore violates what they should do under substantial evidence. Well, there's two points I'd like to make there, Your Honor. The first is it's a little bit unfair to require Mr. Mikhaj to provide evidence with regard to him, specific incidents, as no one in his family, or at least adult males, that would be subject to the type of violence that his family has been subject to, or even President of Albania subsequent to 1997. But more importantly, the country conditions report upon which the BIA relied reference the political situation with the central government. But as Mr. Mikhaj testified, and credibly so in his hearing, the violence against him and his family transcends the political violence that the country conditions refer to and has basically become part of these ongoing generations-long blood feuds. I believe the ---- But I didn't understand what the blood feuds, my understanding is originally were not political in any way. And what makes you think that they've now become linked to the political issues? Well, I mean, Your Honor, the blood feuds have innumerable causes of what is these ongoing vendettas between families. Where is the testimony that the anti-communist issues have turned into a blood feud? It's Mr. Mikhaj's testimony. At record at page 233, Mr. Mikhaj testifies specifically, and had been found credible by the IJ, that his involvement in blood feuds was a tribute of the fact that we were against their system, and it was a very big controversy. So although there are many causes to these generations, generational blood feuds, specifically in this case, the basis for the violence against Mr. Mikhaj's family beyond that attributable directly to the central government in Albania, relates to his opposition to communism generally, which goes on for decades. I mean, you have family members that have been killed since the late 1940s. With respect to a cat claim, does it matter the reason for the threatened violence if he could show that the government is unable or unwilling to control the violence? Indeed, Your Honor, it is not relevant the precise basis. So if you – I mean, the record, as I said, provides some evidence as the basis of the motivation. But here what we have is David Mikhaj's credible testimony. He says on the same page, I believe, that, you know, that people would – or maybe it's on – I'm sorry. He states here – excuse me. Right. It's on page 255. He testifies to his fear of third-party actors on page 255 of the record. And he specifically says that individuals that hate him and his family could kill him and nothing would be done about it. So it's, in the end, not terribly important what the basis of why they are all trying to kill members of his family. Because this is a cat claim rather than an asylum claim. Right. Exactly, Your Honor. Now, moving to the – one point I wanted to just make very clear. Now, you're out of time, but this is a case with enough complexity in it. Let's let you have another two minutes. Okay. And we'll hear from the government. Okay. And we'll make sure you get a chance to respond. Okay. Thank you very much. I just really wanted to make one important point because it's not fleshed out as well as it could have been in the briefs. The real basis – one of the real basis for the B.I.'s decision is his return trips to Albania. And if you look at page 242 and 43 of the record, you have a description by Mr. Mikhaj of the approximate timing of his return trips to Albania. He says, although there's a typo and it's a little hard to parcel out, on 242 he says, it looks like 94, 95, and then a year later it could be 95, then another trip six months later it could be 95 or 96. The main point I wanted to suss out here was that the first few trips that he went to Albania were before these brazen attacks on his family members, basically before Mr. Mikhaj realized that despite the regime change in Albania there were serious threats of violence to his family. So the fact that the B.I.A. relies upon that and says, ah, well, now we know that no threats could possibly exist because he went to Albania, that's just simply untrue. Moreover, the trips where he was in hiding the whole time, he stayed in his mother's house, he avoided sleeping at night. I mean, there's substantial evidence, and under this Court's decisions in Caruni v. Gonzales and Smolniakova v. Gonzales, that, you know, such kind of clandestine brief visits aren't enough in themselves to negate the substantial record that exists in this case of threats of future torture. I'll reserve the rest of my time. Let's hear from the government, then we'll give you a chance to respond.  Thank you very much. May it please the Court, Joan Smiley from the Department of Justice in Washington here on behalf of the Attorney General. The Board's denial of torture convention protection in this case is supported by reasonable, substantial, and probative evidence in the record. Here the record clearly rebuts any presumption of future torture. There are eight reasons that it does this. The first is the country conditions have significantly changed since 1997. As Judge Smith noted, there's a democratically elected government. There's no evidence at all that the former communist government or its supporters Let me ask you this. I'm sorry to interrupt a long list of eight, but given that this is a cat claim, is it sufficient for him to show a cat claim if, and I don't ask you to concede facts, but if he could show that he is in very serious danger of being killed by private parties for whatever reason, whether blood feud or something else, and the government is unwilling or unable to control those parties, does that make out a cat claim? Well, what he has to show under the relevant regulation There's a yes or a no. If you could say yes or no and then say why, does that make out a cat claim? Well, I'd like to say what he does have to show, and I'm not sure it encompasses all the elements that you just recited. So I would rather tell you what the regulation, 8 CFR 1208.18 Okay. Yeah, do it that way then. Okay. Best Yeah, do it your way. Okay. That it's, he must show that it's more likely than not that he will be tortured in Albania by or with the acquiescence of a public official or any other individual acting in an official capacity. That's what he would have to show. Does it matter that the people threatening violence against him are private actors acting for private reasons so long as there is a real threat of that and so long as the government is acquiescing or unwilling to control? Is that right? That is what the case law from this circuit holds. Okay. So it doesn't really matter that the communists may be gone and retribution for political purposes may be gone if it turns out, or if he can show that he's in serious danger from private parties that the government is unable or unwilling to control. Right. If the government acquiesces in that treatment. Yeah. Now, I think I know the answer and I heard the answer on the other side. Is killing torture within the meaning of CAT? Well, the definition of torture under the regulations is the intentional infliction of severe pain or suffering, whether physical or mental, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or another person acting in official capacity. So if you shot somebody and he died immediately, it wouldn't be covered? One would think that, yes, Judge Berzon. Have you made that argument that killing is not torture within the meaning of the statute? No, we have not. Okay. The second way that the any presumption is rebutted is that the members of the pre-1991 communist regime and those who collaborated with the former secret police. It has direct evidence. The problem here, it seems to me, is that at least at points in the BIA's rather short opinion, it seems to be focusing only on the government and not on, as Judge Fletcher has suggested, private parties. And it doesn't deal at all with the fact it regards his going back as proving that he was safe, whereas, in fact, when he went back, it was because one of his brothers was killed and he was threatened and so on, none of which is taken account of. So the fact that there's a general statement that says that nothing is happening after 1990 or 91 does not seem to be his experience. Well, the indication in the record in his asylum application, he says that his brother was killed in 1997 when he returned to help the Democratic Party. Now, whether that help had anything to do with his death, we don't know. In addition, the ---- But it doesn't matter, right? I mean, first of all, the implication certainly is it doesn't. What did he say in his testimony about his brother being killed? He doesn't mention in his testimony that his brother was killed and went back to help with the Democratic Party. Well, Counselor, here's my worry. And again, I kind of hedged when I was talking to counsel. One can talk about country conditions, and if the country conditions really go to the heart of the problem, then one has given sufficient evidence because under our law, the allegations have to be specifically shown to be applicable to this individual's situation. So even if we were to suggest that it was communism, one might suggest that your, if you will, country report might have dealt with that in his individual situation. My worry is that the BIA didn't deal with anything except that. And what I read in the record was we have a blood fight here. And with this blood fight, we have not done anything to control it. People are murdered over it. And now you're sending me back for that. And nobody, the BIA didn't tell me why they had rejected that. They all talk about, in fact, I believe they talk about individually as to the communists. But they say, the best they say is there's no indication that the former communists, whether in the government, opposition, or enforcement organizations, have sought retribution against opponents of the communist regime or many other individuals who have returned to Albania. They focus on the communists. And, frankly, I was happy of my colleague's question because it seems to me that torture need not be by as to a particular political or religious or any of that. It just has to be torture at all. And so I'm reading, where in the BIA opinion that they sent back to me, do they focus in on this individual and what he's alleging? Well, they focus in on the conditions in Albania and the trips that this individual took. And that way they do focus on them. But the trips, I mean, even with regard to that, he says, he explains that he basically was hiding when he was there. And they take the trips as proving that he was safe. And not only was he hiding, but he was threatened and his brother was killed. And they regard that as proving that he was safe and wasn't dangerous. Well, the evidence in the record shows that he used his real name to enter and exit Albania. Which proves something about the government, maybe, but it doesn't prove anything about private people. We're back to the same problem again. Counsel has characterized the trips as brief. However, according to his testimony, they were anywhere from two weeks to a month. Right. Which would not be considered brief. Why does that matter in terms of if he was hiding at the same time? The point is that he was not targeted or harmed in any way while he was there. Well, targeted, and I think he probably was, if we believe that that phone call to his wife while he was in Albania on that last trip was as she thought it was, I think he was targeted. Now, he wasn't killed, but he was clearly targeted with a death threat. Again, as we point out in our brief, it's not clear who that phone call was from. Well, it's not clear except the testimony of his wife is that she said she was quite clear in her own mind with some evidence that she gave to support that conclusion that it was from Albania. Now, you may not believe it, but that's what she thought and that's what she testified. Yes, that is correct. However, again, we would point out that he was not harmed in any way while he was there. And he comes back immediately after that death threat. And never goes back. Soon from under his real name. He never goes back to Albania again. Not according to the testimony. There was no trip after the 1997 one. He says the reason was because he was afraid he was going to get killed. The record is abundantly clear, not only with the State Department reports, but the Human Rights Watch report as well, that, yes, there was a great deal of violence in Albania under communist rule, even after 1992 when the communist regime lost power. However, after 1997, after the economic crisis came to a head, all evidence in the record indicates that the violence, the random criminal attacks, the persecution and other incidents of mistreatment have subsided greatly. This is not just the State Department report. It's all of them. What do we have in the record with respect to the practice of blood feuds continuing in Albania? Excuse me? What do we have in the record with respect to the continuing practice of blood feuds in Albania? There's nothing about the continuing practice. The record indicates that the current government severely punishes blood feuds, which are vigilante actions related to family kinship groups. There's no evidence in the record that these blood feuds are related in any way to those opposing the former communist government. The record says the country continues to experience high – this is from the State Department report – the country continues to experience high levels of violent crime, a number of killings as a result of individual or clan vigilante actions connected to traditional blood feuds. So that's what it says about that. It also says that crime and corruption are declining. Torture is prohibited. The incidents of mistreatment are declining, but they're still at high levels. That's what it says. I mean, from higher levels to high levels, but that's what it says. If we look at the situation of violence in any country, as this Court has indicated in many, many of its precedents, it could entitle the whole population to be granted relief. I mean, to be specific, the problem here is really one of reasoning, it seems to me, that the court, if there is a problem, it's that the BIA relies on the country conditions, but simply doesn't deal with his particular conditions. It doesn't deal with that. Now, it may be able to – maybe they could have, you know, as you're explaining, explaining what you're explaining, but they didn't do that. I mean, you have a theory, which might hold up if we're in a BIA opinion, but it isn't. Well – BIA doesn't deal with these return trips except as proving that he was safe, which it certainly doesn't prove. We would disagree. The BIA decision clearly deals with his return trips, with the country conditions, looks at the evidence. Well, it's not at all clear to me that the BIA actually looks at the evidence, because it says nothing about the threat to him. It says nothing to correct the IJ's clear statement that the family had no trouble after the fall of communism in 1992, which is clearly erroneous. I mean, the evidence in front of me does not tell me that the BIA looked at and understood the full range of evidence. Here, the BIA clearly referenced everything in the record pertaining to the declining situation of violence in Albania. And, yes, there was a climate of violence prior to 1997. Also, the BIA referenced his trips to Albania. It's not clear what more they could have. This is what I meant when I said that you have a theory that might fly. But they don't say that there was violence until 1997 and not thereafter. That's not what they say. They basically say there was nothing after 1992, and they don't deal with his particular evidence of ---- Well, they don't cite the hundreds of pages in the record of these Department of State reports, the profile, the Human Rights Watch reports. They can't do that in every decision. They cannot reference every piece of information that's in the record in these reports. However, they clearly summarized, indicating that, yes, there is a new government there, that maybe these incidents of mistreatment occurred in the past, but the government has changed. The atmosphere is improving. It's not perfect. The reports indicate that, yes, there are still incidents that are occurring there, but that it's dramatically decreased. Even the Human Rights Watch report says so. I would agree with you more if I didn't have the last sort of full paragraph of the BIA opinion here in front of me, where it says we agree with the IJ and that he made these trips after 1992, quote, without difficulty. Well, if you say without difficulty means one of his brothers was killed, one of his brothers escaped from a hand grenade, and he was himself threatened with death, I guess that's without difficulty. But that's not without difficulty. Again, there's no evidence that anything occurred when he went back in that last visit. We have the testimony that there was a telephonic threat made. He was there for a month. He says he was not harmed. He was not targeted. I thought he also said he left as soon as the threat was made. He heard about the threat. I believe he left two days later. But in the preceding period, nothing happened to him. Yeah, well, what you say is true, but I continue to say without difficulty I think does not fairly represent what's in the record. We've taken you well over. Is there anything else you want to say as you sum up? No. Unless the panel has any questions, the government would stand on the brief that it's filed in this case.  Thank you. Your Honor, it's just a couple of quick points that I wanted to touch on. The government ---- If I could, I'd like to ask one question. I didn't get a chance to ask you. Is there anything in this record that any of this blood feud stuff has ever been reported to the government and they've not done anything about it? Yes, there is. Mr. McCarty says in his application that there was no arrest made when his ---- He says there's no arrest made, but that doesn't say that it's reported to the government and they didn't do anything about it. I mean, there's a lot of crime going on in this country which suggests that crimes go on and we don't make arrests. My worry is that what I'm trying to do is ferret out two different situations. One goes along the communist line and one goes along just a blood feud line. And I want to see the evidence that suggests somebody reported this and nobody did anything about it. And he had an obligation to come forward with that kind of stuff. And I guess I'm trying to find where in this record it came. Well, it's in the record, Your Honor. He testifies that I believe it's on in his application that there was no, and in his testimony, and I'm sorry if I don't have the specific citation, he says that there was not only no arrest, but there's no investigation. In his initial application as well, which I believe is on in the record at page three, pardon me. I think he said as far as he's aware there's been no investigation of his brother's murder. Right, yes. There's no investigation of his murder. Now, I said something somewhat different. I said as far as he is aware there's no investigation of the murder of his brother. Well, he's in contact with individuals in Albania. I mean, this isn't. Well, this is a small point and may be in the end not all that important. But to say that he's not aware of any investigation is not necessarily to say there has been no investigation. Now, we could make the inference that if there had been an investigation, he would know about it because the investigators would be talking to his family members about the circumstances. Yes. Okay. There's also reference in the contribution reports that I believe it's cited in the brief that a very large percent of these cases never go anywhere because there's just no arrest or investigation. Also, just with regard to the idea that the BIA somehow, you know, this whole thing about blood feuds is this new thing that the BIA didn't have an opportunity to look at, it's right there in the government's brief before the BIA record on page 11 and on 15. They point it out. With regard to the substantial evidence that the – this reliance on the contrary condition, they say, well, you know, we can say that, you know, Party A and Party B are trying to torture you, and we say that Party A is no longer trying to torture you, and therefore, that's substantial evidence. Well, that's not substantial evidence when Party B is ready to torture you. We've taken both of you well over. Have you got some concluding thoughts on this issue? No, that's it, Your Honor. Thank you very much. With that, I'll submit on it. Okay. Thank both of you for your helpful arguments. Thank you. The case of McCage v. McKazy is now submitted for decision. All rise.
judges: Fletcher, Berzon, Smith